**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

STATE OF GEORGIA,

v.

ERIC A. HEINZE and KRISTOPHER
L. HUTCHENS,

     Defendants.

Criminal Action No.
1:22-cr-00388-VMC

## OPINION AND ORDER

On August 5, 2016, Jamarion Robinson was shot and killed when federal task force officers attempted to execute warrants for his arrest. Two of those officers, Defendants Eric A. Heinze and Kristopher L. Hutchens, were indicted by the State of Georgia on several charges, including burglary, aggravated assault with a deadly weapon, and two counts of felony murder. Defendants filed motions to dismiss the criminal charges against them on immunity grounds (Docs 29, 31), which the State of Georgia opposes. The Court recognizes that the circumstances that led to Mr. Robinson's death are deeply upsetting to those who loved him and to many people in our community. However, the Court must decide cases by applying the law to the facts in evidence. After careful consideration, the Court finds that the State of Georgia has failed to meet its burden of coming forward with evidence to show that Defendants Heinze and Hutchens are not entitled to

Supremacy Clause immunity. Therefore, Defendants' motions to dismiss are granted, and the indictment against them is dismissed.

## Background

### I.    Facts[1]

The origins of this case stem from three warrants issued for the arrest of Jamarion Robinson. Specifically, Gwinnett County, Georgia issued an arrest warrant for Mr. Robinson's attempted arson at his mother's home on July 11, 2016, and Fulton County, Georgia issued two arrest warrants after Mr. Robinson allegedly pointed a gun at two Atlanta Police Department ("APD") officers near an apartment he was squatting at on July 27, 2016. (*Id.* at 47; Joint Ex. 1). Around August 3, 2016, the Atlanta Fugitive Squad sent the Southeast Regional Fugitive Task Force ("SERFTF") a fugitive package on Mr. Robinson which included information about the three active arrest warrants. (Doc. 88 at 40–42).

Stephen O'Hare, an APD officer and SERFTF Task Force Officer ("TFO") was put in charge of locating Mr. Robinson so that SERFTF could execute the arrest warrants. (Doc. 88 at 48). TFO O'Hare had at least four data points on Mr. Robinson's locations. First, he was aware that APD officers responded to 500 Northside Circle regarding someone squatting in an empty apartment and found

---

[1] Additional facts will be discussed as needed to address the parties' contentions. Unless otherwise noted, these facts are undisputed. Citations are to the page numbers in the CM/ECF header.

personal items, including Mr. Robinson's identification. (Joint Ex. 1). Second, between August 3 and August 4, TFO O'Hare received information indicating that Mr. Robinson may be staying near Turner Field (in downtown Atlanta). (*Id.*). Third, TFO O'Hare had received GPS data from Mr. Robinson's cell phone showing his location within four miles of Mr. Robinson's former girlfriend, Dartangela White's apartment on August 2. (Joint Ex. 1). And fourth, on August 5, Mr. Robinson's mother provided TFO O'Hare with a phone number her son had called from the day before. (*Id.* at 51). TFO O'Hare was able to connect the number to White. (*Id.* at 52).

Armed with this information, TFO O'Hare went to White's apartment complex on the morning of August 5 and spoke with management who confirmed that White lived in the apartment complex but could not confirm that Mr. Robinson lived with her. (Doc. 88 at 54). O'Hare asked a maintenance man for help confirming whether Mr. Robinson was inside White's apartment, but the maintenance man was unable to get into the apartment. (*Id.* at 55; Joint Ex. 1). When White returned to the apartment that same day between 11 a.m. and 12 p.m., the maintenance man made a second attempt to get inside. (Joint Ex. 1). This time he was able to enter and reported that he was sure that Mr. Robinson was inside the apartment. (*Id.*; Doc. 88 at 55–56).

At around 1:00 p.m. that day, TFO O'Hare, the other SERFTF TFOs, and local law enforcement officers gathered at a nearby location to plan for Mr. Robinson's arrest.[2] (*Id.* at 56–57). There were about fifteen officers at that meeting. (*Id.* at 57). TFO O'Hare gave an overview of the arrest warrants issued for Mr. Robinson and details about White's apartment. (*Id.* at 57–58). The TFOs made the decision to knock and announce, but if Mr. Robinson did not answer, the TFOs would enter White's apartment to arrest him. (Doc. 88 at 223; Doc. 91 at 177–78).

TFO Josh Mauney prepared the tactical plan for entry into White's apartment. (Doc. 88 at 59). The tactical plan placed Defendant Heinze at the front of the stack of officers holding a ballistic shield and a handgun. (*Id.* at 62–63; Doc. 91 at 56). Defendant Hutchens was second and carried a rifle. (Doc. 88 at 63; Doc. 91 at 57). TFO Danny Doyle was in the third position and carried a submachine gun. (Doc. 88 at 63–64; Doc. 91 at 57). TFO Mauney and another officer were in the fourth and fifth positions. (Doc. 88. at 64). TFO O'Hare was to the right covering the door of the next apartment, and TFO Willie Sauls had a ram to open the door, if necessary. (*Id.* at 64–65). All the officers wore something that identified them as police or U.S. Marshals. (*Id.* at 198; Doc. 91 at 64). There was also a marked police car in the front parking lot to show bystanders that a law enforcement operation

---

[2] Another TFO maintained surveillance of White's apartment while this meeting took place. (Joint Ex. 1).

was taking place. (Doc. 88 at 216; Doc. 91 at 60–61). Finally, a medic was present to render timely aid in case anyone was hurt. (Doc. 91 at 59).

With the tactical plan in place, the officers headed to White's apartment. By 1:35 p.m., they had surrounded her apartment. (Joint Ex. 1). Defendant Hutchens did the initial knock and announce at the front door of White's apartment. (Doc. 88 at 65). No one answered. (*See id.*). A few minutes later, TFOs received a report from one of the local law enforcement officers covering the back of the apartment that someone was upstairs running around inside the apartment. (*Id.* at 66, 120). The officers then decided to breach the front door. (*Id.* at 66; Doc. 91 at 71).

TFO Sauls breached the door, but none of the TFOs entered White's apartment right away. (Doc. 91 at 73). Instead, they announced their presence and asked Mr. Robinson to surrender. (*Id.* at 74). Defendant Heinze then heard sounds from upstairs and continued to ask Mr. Robinson to come down. (*Id.* at 75). He then saw feet at the top of the stairs and Mr. Robinson descend slowly down the stairs. (*Id.*). As Mr. Robinson came down the stairs, Defendant Heinze could see that he had something in his hands. (*Id.* at 76). Within a few seconds, Defendant Heinze realized that Mr. Robinson was holding a gun and pointing it directly at the officers. (*Id.* at 76–77). Defendant Heinze immediately started firing shots at Mr. Robinson. (*Id.* at 76). TFO Doyle also screamed that Mr. Robinson had a gun and fired his gun. (*Id.*). Mr. Robinson went back up the stairs, and the officers

stopped shooting and gave Mr. Robinson commands to put down the gun and come downstairs. (*Id.* at 78). Defendant Heinze also stepped away briefly to do a tactical reload of his gun since it could not fire. (Doc. 88 at 203–04). Defendant Heinze then heard what sounded like Mr. Robinson racking his gun twice and firing two shots. (Doc. 91 at 78–79). Mr. Robinson came back into view with his gun pointed at the officers. (*Id.* at 79). Defendant Heinze, Defendant Hutchens and TFO Doyle discharged their guns. (*Id.* at 80). Mr. Robinson fell down so that half of his body was on the stairs. (*Id.*). The three TFOs stopped firing their guns because they could no longer see Mr. Robinson's gun, but they moved inside to the base of the stairs to improve their vantage point and continued to give commands to Mr. Robinson. (*Id.* at 80–82). When Mr. Robinson began to lean over and lift the gun and point it again, the officers fired at him again. (*Id.* at 82). Mr. Robinson leaned back over, and the officers could no longer see his gun. (*Id.*).

To determine if Mr. Robinson was still a threat, Defendant Hutchens deployed a flashbang to see if Mr. Robinson would respond. (Doc. 88 at 207–08). Mr. Robinson did not respond to the loud noise created by the flashbang. (Doc. 91 at 83). TFO Mauney then threw a robot with live video feed to locate Mr. Robinson's hands or the gun since neither could be seen from the TFOs' vantage point at the bottom of the stairs. (Doc. 88 at 208–09; Doc. 90 at 142). TFO Mauney indicated that the gun was at the top of the stairs. (Doc. 91 at 84). Defendants

Heinze and Hutchens and TFO Doyle remained at the base of the stairs while four or five TFOs entered the residence to clear the ground floor. (Doc. 88 at 76; Doc. 91 at 84–85). Then, while holding the shield, Defendant Heinze and TFO Sauls went up the stairs to bring Mr. Robinson downstairs. (Doc. 91 at 85). Mr. Robinson received aid from the medic but died on the scene. (Doc 88 at 216–17; Doc. 91 at 86).

That same day, the local police requested that the Georgia Bureau of Investigation ("GBI") assist with the investigation of Mr. Robinson's shooting. (Doc. 91 at 144–45). Josh Ellis was assigned as the crime scene agent. (*Id.* at 146). Ellis processed the scene and recovered a .380 caliber Hi-Point firearm at the top of the stairs and three spent .380 caliber shell casings. (Doc. 89 at 124, 170–71). He also recovered thirty-eight spent shell casings from Defendant Heinze's weapon, seven spent shell casings from Defendant Hutchens's weapon, and 46 spent shell casings from TFO Doyle's weapon. (*Id.* at 169–170). Aside from the physical crime scene evidence, another resident in White's apartment complex came forward with video he recorded of the incident. ("the Video," Ex. G4). The Video recorded the sound of additional shots being fired from inside White's apartment shortly after the flashbang was deployed, and before the robot was used. (*Id.*). However, Defendants contend that they did not fire or hear any shots after the flashbang detonated. (Doc. 91 at 84).

## II.    Procedural History

On October 26, 2021, a Fulton County, Georgia grand jury returned an eight-count indictment against Defendants charging them with two counts of felony murder, aggravated assault with a deadly weapon, burglary in the first degree, making a false statement, and violation of oath by a public officer. (Doc. 1). Defendant Hutchens was also indicted for an additional count of making a false statement. (*Id.*).

After their indictment, Defendants removed the case from the Fulton County Superior Court to this Court, under 28 U.S.C. § 1455. (*Id.*). On October 25, 2022, the Court denied the State of Georgia's ("the State") motion to remand the case back to state court reasoning that removal was proper because Defendants were federal officers at the time of the events in question and had raised a colorable federal defense. (*Id.*). Defendants then moved to dismiss (Docs. 29, 31) the charges against them.[3] The Court held a five-day evidentiary hearing (Docs. 88-92), the parties filed post-hearing briefings (Docs. 95, 96, 101, 105), and the parties and the

---

[3] Given his amended filing (Doc. 31), Defendant Heinze's original Motion to Dismiss Pursuant to the Supremacy Clause of the United States Constitution and on other grounds (Doc. 30) is denied as moot.

United States as a party in interest, participated in oral argument (Doc. 140).[4] The issues raised in the Motions to Dismiss are now ripe for decision.[5]

## Legal Standard

Under Rule 12(b), a party "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12. Federal courts have recognized that a Rule 12(b) motion is the proper way for defendants to assert an immunity defense. *New York v. Tanella (Tanella I)*, 281 F. Supp. 2d 606, 611 (E.D.N.Y. 2003), *aff'd*, *New York v. Tanella (Tanella II)*, 374 F.3d 141 (2d Cir. 2004); *see also Fair v. State*, 664 S.E.2d 227, 230 (Ga. 2008) (immunity from prosecution based on self-defense must be determined pretrial). Defendants have raised immunity defenses under the Supremacy Clause of the U.S. Constitution and for self-defense under Georgia law.

---

[4] *See* 28 U.S.C. § 517.

[5] Given the issues raised by the State's appeal of the Court's denial of its motion for a limited remand (Doc. 77), the Court determined that it would be inappropriate to rule on the Motions to Dismiss while the State's appeal was pending. *See United States v. Tovar-Rico*, 61 F.3d 1529, 1532 (11th Cir. 1995) ("[T]he filing of a notice of appeal divests the district court of jurisdiction over the aspects of the case involved in the appeal."). The State's appeal was dismissed on April 7, 2026, and the mandate was issued on May 7, 2026. (Docs. 172–173). On June 4, 2026, the State confirmed that it would not seek a superseding indictment against Defendants. (Doc. 184 at 2).

On a motion to dismiss a criminal indictment, all evidence is viewed in the light most favorable to the State, and the Court assumes the truth of the allegations in the indictment. *Texas v. Kleinert*, 143 F. Supp. 3d 551, 557 (W.D. Tex. 2015), *aff'd*, 855 F.3d 305 (5th Cir. 2017). That said, where a defendant has raised a threshold showing of immunity, a state cannot meet its burden going forward "merely by way of allegations." *Id.* (citing *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988)); *Tanella II*, 374 F.3d at 148 (same). As a motion to dismiss is not a substitute for a jury trial, it "should be granted only if the underlying facts supporting the defense are not in dispute." *Id.*

### Discussion

The foundational case on Supremacy Clause immunity is *In re Neagle*, 135 U.S. 1 (1890). A deputy United States Marshal tasked with protecting a Supreme Court justice shot and killed a man who assaulted the justice. *Id.* at 3–4. The State of California arrested the deputy and charged him with murder. *Id.* The federal trial court released the deputy on a writ of habeas corpus, finding that the deputy could not be criminally prosecuted for doing his job. *Id.* at 6. In affirming the lower court's decision, the Supreme Court concluded that:

> if [a federal officer] is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the state of

10

> California. When these things are shown, it is established that he is innocent of any crime against the laws of the state, or of any other authority whatever. There is no occasion for any further trial in the state court, or in any court.

*Id.* at 75.

*Neagle* establishes a two-prong test. First, a federal officer must make a threshold showing that he was performing an act he was authorized to do under federal law. *Id.* Second, the federal officer must make a threshold showing that while performing that authorized act, he did no more than what was necessary and proper for him to do. *Id.* "To meet this standard, the officer: 1) "must subjectively believe that his action is justified; and 2) that belief must be objectively reasonable."[6] *Tanella II*, 374 F.3d at 147. Once the federal officer has met his burden, "the state cannot overcome that defense merely by way of allegations." *Long*, 837 F.2d at 752. Instead, the state "must come forward with an evidentiary showing sufficient at least to raise a *genuine* factual issue whether the federal officer was acting pursuant to the laws of the United States and was doing no more than what was necessary and proper for him to do in the performance of his duties." *Id.*

---

[6] Some courts only look to the objective reasonableness of the federal officer's actions to determine whether the federal officer is entitled to Supremacy Clause immunity. *See Wyoming v. Livingston*, 443 F.3d 1211, 1221–22 (10th Cir. 2006) (questioning the subjective element of the Supremacy Clause immunity test). Rather than resolving this issue, and for the sake of completeness, the Court will consider whether Defendants' beliefs were both objectively and subjectively reasonable.

## I.    The First Prong: Whether Defendants' Acts Were Authorized by Federal Law

The first prong of the Supremacy Clause immunity test asks whether the federal officers were authorized by federal law to engage in the conduct identified in the criminal indictment. Defendants point out that the Court has already determined that they have satisfied the first prong of the Supremacy Clause immunity test. In its Order denying the State's motion to remand, the Court found that Defendants were acting within the scope of their federal authority. (Doc. 2). As explained in that Order, the evidence shows that Defendants were acting as SERFTF officers performing a federal duty to execute arrest warrants for Mr. Robinson when they entered White's apartment. (*Id.* at 14). They were also performing that federal duty when they used force after Mr. Robinson pointed a gun at them. (*Id.* at 16–17).

The State argues that Defendants acted beyond the scope of their authority because they violated the Fourth Amendment by surrounding and entering White's apartment without a search warrant, and later firing dozens of shots at Mr. Robinson. (Doc. 105 at 14). However, these arguments go to the reasonableness of their actions and do not refute Defendants' contention that they were acting within the scope of their authority as federal officers tasked with arresting Mr. Robinson. *See Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982) (rejecting the argument that a federal agent was acting beyond the scope of his authority when

12

he participated in a bribery attempt as part of a federal investigation). Thus, the Court reiterates that Defendants satisfy the first prong of the Supremacy Clause immunity test.

## II.    The Second Prong: Whether Defendants' Actions Were Necessary and Proper

The Court next turns to whether, in committing the acts giving rise to the indictment, Defendants did no more than what was necessary and proper. The most serious charges in the indictment are the two counts of felony murder stemming from burglary and aggravated assault with a deadly weapon. Because the murder charges depend on the underlying felonies, the Court will first look at the evidence provided by Defendants to determine whether they satisfy the second prong of the Supremacy Clause immunity test for the burglary and aggravated assault charges. If Defendants meet their burden, the Court will then determine whether the State has met its burden of coming forward with evidence sufficient to rebut Defendants' evidence.

### A.    The Alleged Burglary

In Georgia, "[a] person commits the offense of burglary in the first degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant dwelling house of another…" O.C.G.A. § 16-7-1 (2012). To obtain Supremacy Clause immunity, Defendants must have subjectively believed that their act of entering

13

White's apartment was justified and their belief must have been objectively reasonable. The subjective inquiry requires a federal officer to demonstrate that he reasonably thought his actions were "necessary or in retrospect justifiable." *Clifton*, 549 F.2d at 728. In assessing this prong of the Supremacy Clause immunity test, courts "must view all the circumstances as they appeared to [the federal officer]." *Tanella II*, 374 F.3d at 147. If the court is satisfied that a federal officer had no motive other than to perform his or her job duties, the subjective element is satisfied. *Tanella I*, 281 F. Supp. 2d. at 620. Notably, "a mistake in judgment or a 'botched operation,' . . . will not of itself subject a federal agent to state court prosecution." *Long*, 837 F.2d at 745.

### 1. Defendants' subjective belief that they could enter White's apartment was objectively reasonable.

At the evidentiary hearing, Defendant Heinze testified that he thought it was necessary and proper to enter White's apartment without a search warrant as permitted by relevant case law because TFO O'Hare advised all the officers that Mr. Robinson had established residency at White's apartment. (Doc. 91 at 99); *see Payton v. New York,* 445 U.S. 573, 603 (1980). Because Defendants' determination about whether entry into White's residence was authorized involved an application of law to facts, both prongs of the reasonableness inquiry dovetail.

14

It is undisputed that Defendants relied on evidence collected by TFO O'Hare indicating that Mr. Robinson was residing at White's apartment. Defendant Heinze testified to the following:

> Q: After the briefing, the informational briefing, did you form a belief as to whether or not 3129 Candlewood Road, Apartment D, Ms. White's apartment, was a first party residence under *Payton v. New York* and your training?
>
> A: Yes sir, to also add that TFO O'Hare identified and advised us that it was a first party. He has established residency based off the totality of his investigation and that it was a first party residence.
>
> Q: Did you form a belief as to whether or not TFO O'Hare's belief as expressed to you was reasonable that this was a first party residence?
>
> A: Absolutely.

(Doc. 91 at 54).

Under the framework laid out by the Supreme Court in *Payton,* a valid arrest warrant provides law enforcement with implicit authority to enter a residence if: 1) the suspect resides there; and 2) there is reason to believe the suspect is inside. 445 U.S. at 603. The Eleventh Circuit has provided additional guidance on the second *Payton* prong:

> We think it sufficient to hold that in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be

15

> searched is the suspect's dwelling, and that the suspect
> is within the residence at the time of entry.

*United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995). "In evaluating this on the spot determination, as to the second *Peyton* prong, courts must be sensitive to common sense factors indicating a resident's presence." *Id.*

For illustration, in *United States v. Bennett*, 555 F.3d 962, 964 (11th Cir. 2009), the Eleventh Circuit rejected a defendant's argument that law enforcement did not have a reasonable belief that he resided at his mother's apartment because his name was not on the lease, and he only stayed overnight occasionally. *Id.* Prior to the search of the defendant's mother's apartment, the agents were advised by out-of-state FBI agents that the defendant lived with his mother. *Id.* at 965. The agents discovered that the defendant had recently delivered rent for the apartment to the building's landlord, that the landlord had spoken with the defendant at the front door of the apartment, and that defendant's mother had informed the landlord that the defendant was "in and out" of the apartment. *Id.* Based on these facts, the Eleventh Circuit concluded that it could not "say that the agents' belief that [the defendant] resided in the apartment was unreasonable under the totality of the circumstances." *Id.; see also United States v. Bellamy*, 456 F. App'x 863, 865 (11th Cir. 2012) (holding that the officers had a reasonable belief that the defendant resided at his girlfriend's residence where officers saw a vehicle used by the defendant at the apartment and had a positive identification by a maintenance worker).

Furthermore, there is no minimum amount of time that officers must wait to execute an arrest warrant once they have a reasonable belief that a suspect is residing at a particular place. In *United States v. Mastin*, 972 F.3d 1230, 1236 (11th Cir. 2020), the Eleventh Circuit affirmed a district court's finding that officers were entitled to enter a hotel room to execute arrest warrants for two fugitives because they reasonably believed the hotel room was either of the fugitives' dwelling. The district court's opinion detailed how arrests were made within a day of officers learning that: the fugitives were frequenting hotels in the city but using the name of a girlfriend or someone else to rent rooms; the name of one of the fugitive's girlfriend; that the girlfriend had rented a room at a specific hotel; that the desk clerk confirmed the girlfriend was a hotel guest; that when the girlfriend paid for the room, another person was in the vehicle with her; that shortly after midnight, officers conducting surveillance saw the girlfriend and three men who generally matched the fugitives' descriptions arrive at the same time in separate cars; and that the girlfriend went to the front desk while the men entered the hotel through a side entrance. *United States v. Mastin*, No. 2:15-cr-542, 2018 WL 1005158, at *8 (M.D. Ala. Jan. 2, 2018), *report and recommendation adopted*, 2018 WL 1004484 (M.D. Ala. Feb. 21, 2018).

In light of Defendant Heinze's testimony that he made the determination that he could enter White's apartment based on his understanding of governing

law and considering the lack of evidence that Defendants had any motive in in entering White's apartment other than to execute the arrest warrants for Mr. Robinson, Defendants have met their burden of showing a subjectively reasonable belief that they could enter White's apartment to arrest Mr. Robinson. Moreover, considering the above precedent, Defendants have met their burden of showing that their subjective belief was objectively reasonable. Defendants did not need formal proof that Mr. Robinson resided with White; it was enough that he occasionally stayed there, even for as little as the preceding night, and had been identified as being at the apartment on the same day as the incident. Therefore, as to the alleged burglary, Defendants have met their threshold burden of showing that their actions were necessary and proper.

### 2. The State has not met its burden of establishing a material factual dispute.

As the Court noted earlier, once a federal officer has raised a threshold defense of immunity, the State bears the burden of "com[ing] forward with an evidentiary showing sufficient at least to raise a *genuine* factual issue whether the federal officer was . . . doing no more than what was necessary and proper for him to do in the performance of his duties." *Long*, 837 F.2d at 752. The State cannot meet its burden "merely by way of allegations." *Id.; see also City of Jackson v. Jackson,* 235 F. Supp. 2d 532, 534 (S.D. Miss. 2002) (stating that when a "Supremacy Clause immunity defense [is raised] by way of motion to dismiss, the district court should

18

grant the motion in the absence of an affirmative showing by the state that the facts supporting the immunity claim are in dispute").

In the civil context, the Eleventh Circuit has explained that "[a] 'material' fact is one that 'might affect the outcome of the suit under the governing law.'" *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To raise a "genuine" dispute, the nonmoving party must point to enough evidence that "a reasonable jury could return a verdict for [him]." *Id.*

The State attempts to create a fact dispute as to whether Defendants subjectively believed Mr. Robinson lived at White's apartment, because in their post-incident interviews with GBI investigators, they only said that it was White's apartment and that Mr. Robinson had only called his mother from White's phone the day before. (Doc. 105 at 22). But even if the Court only relied on the State's assertions, it would not disprove the honesty of Defendants' belief that they could enter White's apartment. Indeed, every officer who testified at the evidentiary hearing on this issue believed on the date of the incident that entry into White's apartment was proper. (Doc. 88 at 59; Doc. 91 at 54, 185). There is also no evidence that Defendants, who had engaged in dozens of SERFTF arrest operations, did anything out of the usual or with an improper motive. The lack of evidence of

19

criminal intent is critical, as recognized in a case where federal employees were charged with robbery after searching premises pursuant to an unlawful warrant:

> [W]here an officer, from excess of zeal or misinformation, or lack of good judgment in the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and invades the rights of individuals, he is answerable to the government or power under whose appointment he is acting, and may also lay himself liable to answer to a private individual who is injured or oppressed by his action; yet where there is no criminal intent on his part he does not become liable to answer to the criminal process of a different government.

*See In re Lewis*, 83 F.159, 160 (D. Wash. 1897). Thus, even if Defendants' judgment was wrong, without evidence of improper motive, the State cannot rebut Defendants' evidence that they subjectively believed that they could enter White's apartment.

Next, the State argues that Defendants' belief that Mr. Robinson resided at White's apartment was not objectively reasonable. The State argues that TFO O'Hare could not have reasonably believed that Mr. Robinson lived in White's apartment because (i) he knew about other locations where Mr. Robinson might have established residence, (ii) enough time did not pass for Mr. Robinson to establish residence in White's apartment, (iii) and no one ever affirmatively told TFO O'Hare that Mr. Robinson resided at White's apartment. (Doc. 105 at 25–27). But the case law that the Court cited above establishes that Defendants' actions were objectively reasonable as a matter of law even considering those facts.

20

Moreover, the State is mistaken to focus on TFO O'Hare's belief instead of the reasonableness of Defendants' belief. The fact that Defendants relied on conclusions made by TFO O'Hare that were arguably unfounded does not automatically create a genuine dispute of fact, absent some evidence that would put Defendants on notice that they should question those conclusions. *See Baucom*, 677 F.2d at 1350 ("Even if the officer makes an error in judgment in what the officer conceives to be his legal duty, that alone will not serve to create criminal responsibility in a federal officer."). "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part." *United States v. Gonzalez*, 969 F.2d 999, 1005 (11th Cir. 1992) (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). Therefore, "[a] policeman's mistaken belief of fact . . . can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances." *Id.* at 1006.

The State does not approve of TFO O'Hare's investigation and the conclusions he drew from it. However, the State has not provided a genuine factual dispute showing that Defendants' belief in O'Hare's information was unreasonable considering all the circumstances. As the Court explained above, Defendants established that they reasonably believed they could enter White's apartment based on information provided by TFO O'Hare. Defendant Heinze

21

testified that he had done dozens of fugitive operations with TFO O'Hare and considered him to be one of the best fugitive investigators on the task force and trusted O'Hare's skill and experience. (Doc. 91 at 47). The State has not pointed to any evidence rebutting the reasonableness of Defendants' reliance on O'Hare's information and therefore has not rebutted Defendants' evidence that their belief that they could enter White's apartment was objectively unreasonable.

Defendants have met their burden of showing that their entry into White's apartment based on the arrest warrants alone was necessary and proper. Consequently, the Court does not need to reach the State's argument that Defendants did not have a subjective and objectively reasonable belief that exigent circumstances justified entry into White's apartment. The Court finds that Defendants are entitled to Supremacy Clause immunity on the burglary-related charges (Counts 2 and 4).

## B.    The Alleged Aggravated Assault with a Deadly Weapon

As with the felony charge related to an alleged burglary, the Court will now decide whether the parties have met their respective burdens as to the charges related to aggravated assault with a deadly weapon. Under Georgia law, an assault is an "[a]ttempt[] to commit a violent injury to the person of another" or "an act which places another in reasonable apprehension of immediately receiving a violent injury," and "[a] person commits the offense of aggravated assault when

he or she assaults . . . (2) with a deadly weapon . . . ." O.C.G.A. §§ 16-5-20, -21 (2016). So, Defendants must show that when they attempted to shoot Mr. Robinson or put him in apprehension of being shot, they did so based on a reasonable belief that it was necessary.

### 1. Defendants' subjective belief that they needed to fire shots at Mr. Robinson was objectively reasonable.

As to the act of aggravated assault with a deadly weapon, Defendant Heinze testified that he did not begin firing shots at Mr. Robinson until he saw a gun in Mr. Robinson's hand:

> A: He had something in his hand, and his hands were punched out in front of him as he was slowly walking down the stairs and leaning against the wall.
>
> Q: And at some point did you realize what was in his hands?
>
> A: Yes. I advised the team that he has something in his hands, and I also said that I can't see what it was actually. Within just a few seconds it became crystal clear that he was holding a silver and black semi-automatic pistol, and it was pointed directly at myself and other marked law enforcement officers.
>
> Q: What did you do?
>
> A: So I was in fear of my life and the life of my fellow co-workers. I discharged my firearm several times.

(Doc. 91 at 76–77).

After the initial shots, Defendant Heinze testified that he continued to give Mr. Robinson commands to put down the gun and surrender. (*Id.* at 77). But Mr.

23

Robinson ignored those commands and instead reloaded his firearm and pointed it at the TFOs a second time. (*Id.* at 79). Defendant Heinze testified that, at this point, he, Defendant Hutchens, and TFO Doyle discharged their firearms. (*Id.*).

> Q: And what happened then?
>
> A: I recall at that point Mr. Robinson had fell to the - - on the stairs. His legs were closer to the door while his upper body was near the top of the landing.
>
> Q: And what did you do at that point?
>
> A: Stop firing. The gun was no longer visible, was not pointed in our direction. We began to give verbal commands again to Mr. Robinson, and once he fell, we wanted to shrink the problem by moving to the base of the stairs.

(*Id.*). Defendant Heinze testified that Mr. Robinson was still alive following this second exchange of gunfire, so the TFOs continued to give him commands to show his hands and drop the gun. (*Id.* at 80). Defendant Heinze then testified that he saw Mr. Robinson lean over, begin to lift the firearm, and point it again directly in his direction. (*Id.* at 81). This resulted in a third round of shots fired by the TFOs. (*Id.*). Defendant Heinze was adamant that none of the TFOs fired shots at Mr. Robinson above the bottom of the stairway. (*Id.* at 87). He denied seeing, hearing, or feeling any gunshots after the flashbang was deployed. (*Id.* at 84, 88, 132).

Defendant Heinze's testimony establishes that Defendants only fired their weapons at Mr. Robinson because they believed he was a threat to their safety. There is no evidence that Defendants acted with any motive other than the desire

24

to perform their job duties. Thus, Defendants have met their burden of showing that they subjectively believed that their use of force towards Mr. Robinson was reasonable.

Defendants have also established that their use of deadly force was objectively reasonable. It is well established that the use of deadly force is reasonable to prevent an immediate threat of physical harm to an officer. *See Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010). The Eleventh Circuit has explained that:

> the use of deadly force is more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force.

*Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)). It is also reasonable for an officer to use deadly force when a person ignores an officer's lawful command to drop his firearm. *Id.* at 851.

At the evidentiary hearing, Paul Massock testified as the defense's expert in the use of force by law enforcement, use of force investigations, and the investigation of use of force by law enforcement officers. (Doc. 90 at 74). He testified that under Department of Justice ("DOJ") guidelines, an officer is authorized to use deadly force when he has a reasonable belief that the subject

25

poses an immediate threat or an imminent danger of death or serious physical injury to them or someone else. (*Id.* at 113–14). The evidence shows that Mr. Robinson came down the stairs with a gun in his hand and pointed it at the officers. Massock opined that Mr. Robinson posed an immediate threat that justified the use of deadly force by Defendants and TFO Doyle. (*Id.* at 121). Likewise, each time Mr. Robinson pointed his gun at the officers, he posed an immediate threat, including when he was lying at the top of the stairs. (*Id.* at 125, 137–38). Massock testified that he would expect the officers to shoot until there was no longer an imminent threat of death or serious physical injury, such as the person surrendering, becoming incapacitated, or moving out of view. (*Id.* at 126). Massock explained that once the person moved out of view, the officers would have stopped shooting and resumed verbal commands to prevent being injured and to try to end the gunfight through compliance. (*Id.* at 126–27). In Massock's opinion, Defendants' actions and tactics on August 5, 2016, tracked with law enforcement training and policy. (*Id.* at 151).

In addition to Massock's testimony, DOJ investigated the incident and determined that Defendants used a reasonable amount of force against Mr. Robinson. The DOJ's Office of the Inspector General ("OIG") and its Civil Rights Division reviewed the matter. OIG declined to investigate, and the Civil Rights Division declined to prosecute Defendants. Further, the DOJ's USMS Shooting

Review Board reviewed Defendant Heinze's involvement in the case and concluded that "[e]ach discharge of [his] firearm was authorized under USMS Policy" and that, "[f]rom all accounts of this incident, [he] conducted [him]self in a professional, reasonable, and proper manner under very dangerous circumstances." (Doc. 30-3).

In sum, Defendants have satisfied their burden of showing that their subjective belief that they needed to use deadly force was objectively reasonable.

### 2. The State has not met its burden of establishing a material factual dispute.

The Court now turns to the State's arguments that there are disputes of material facts that should preclude the Court from finding that Defendants are entitled to Supremacy Clause immunity as to the assault charges.

### a. The State's contention that Defendants used excessive force before the flashbang.

The State argues that Defendants' use of force would have been excessive, and thus not necessary and proper, if they fired at Mr. Robinson when he was not an active threat. (Doc. 105 at 38). In support of their contention that Defendants used excessive force, the State relies on the testimony of Michael LaForte, an expert in crime scene reconstruction and analysis. LaForte opined that the physical evidence (bullet fragments, wall defects, blood spatter and human tissue) in Bedroom 1 did not line up with the officers' statements that all their shots were

fired from the front door or the bottom of the stairs. (Doc. 92 at 56). Instead, he believes five shots were fired by an officer in Bedroom 1 and that one of those shots hit Mr. Robinson. (*Id.* at 59–60). The shooter, he opined, was either at the top of the stairs on the landing or in the doorway of Bedroom 1, most likely in a crouched position. (*Id.* at 71, 169). LaForte also testified that these shots would have been early in the encounter.

> Q: Okay. Do you think it's a fair statement to say that it's most likely that the shots to Mr. Robinson that you say occurred in the back bedroom, that those were among the first shots that he received?
>
> A: I would say it was very early on in the encounter, yes.
>
> Q: Okay. So we can agree that those shots did not occur toward the end of the gunshots that were fired?
>
> A: Based on the presence of blood spatter, yes, I would say that it was toward the beginning.

(Doc. 92 at 168).

Defendants rely on the testimony of GBI Agent Josh Ellis to refute LaForte's opinions (*see* Doc. 89 at 111–12), but it is not the Court's role on a Motion to Dismiss to determine the truth or falsity of LaForte's testimony. Even so, the discrepancies between the record and LaForte's testimony do not raise a *material* factual dispute. Even if one of the TFOs went upstairs and fired shots, it does not disprove the unrefuted evidence that Defendants only fired when Mr. Robinson was an active threat i.e. pointing his gun at them. Indeed, LaForte agrees that any shots fired in

28

Bedroom 1 would have been earlier in the encounter. The unrefuted evidence by Defendants is that Mr. Robinson repeatedly posed a threat until he was immobile on the staircase. So even if Mr. Robinson was shot in Bedroom 1, it would have been at a time when he was armed and could still be a threat to the officers. Thus, LaForte's testimony does not rebut Defendants' evidence that their actions were necessary and proper.

Finally, the State makes passing references (Doc. 105 at 19, 42) to the fact that the officers fired dozens of shots at Mr. Robinson, thereby proving they used excessive force. However, the State's own use of force expert, Warren Pickard, agreed that Mr. Robinson pointing a gun at the officers justified the use of deadly force. (Doc. 91 at 279). Instead, Pickard took issue with the fact that the officers fired so many shots rather than just one shot at Mr. Robinson's head. (*Id.* at 279–81). Since the parties agree that Defendants' use of deadly force was justified whenever Mr. Robinson pointed his gun at the officers, the State's displeasure with the number of shots fired before the flashbang went off is immaterial.

### b. The State's contention that Defendants used excessive force after the flashbang.

The State also argues that Defendants are not entitled to Supremacy Clause immunity because the Video and testimony from one of the APD officers establishes that additional shots were fired after Mr. Robinson was unresponsive and no longer a threat to officers. (Doc. 105 at 34). The State has pointed to evidence

that shots were fired after the flashbang and since Defendants deny that any such shots were fired, a factual dispute exists between the parties. *Robinson v. Sauls*, 46 F.4th 1332, 1342 (11th Cir. 2022).[7]

To attempt to prove that Defendants used excessive force, the State heaps inferences on top of inferences. It asserts that the fact that Defendants and TFO Doyle were the only officers who fired their guns supports an inference that at least one of those officers fired the post-flashbang shots. (Doc. 105 at 37). The State next argues that since Mr. Robinson was the only target, another reasonable inference is that whoever continued shooting was in fact shooting towards Mr. Robinson. (*Id.*). And since Defendant Heinze testified that there would be no reason to lie about an accidental discharge, then those shots constituted intentional excessive force. (*Id.*). Although the State would like a jury to make those inferences in its favor, they are not reasonable given the evidence (or lack thereof).

---

[7] *Robinson* was the civil dispute arising from the facts of this case. 46 F.4th at 1342. In that case, the Eleventh Circuit found that the video evidence and TFO Mauney's testimony created "a genuine dispute of material fact as to whether Officers Doyle and Heinze used excessive force by shooting Mr. Robinson after he became unresponsive."). The State objected to the Court's consideration of the record in the civil case (Doc. 105 at 9–10) and though TFO Mauney was called as a witness at the evidentiary hearing here, he was not asked about his testimony in the civil case. Therefore, the Court does not consider that evidence here. The Court notes in passing that if it had been introduced, it would exculpate Defendant Hutchens, conflict with the State's expert evidence (*see infra* note 8), and provide further support for the Court's conclusion that there is insufficient evidence for a jury to find Defendants guilty.

"In a criminal case, the ultimate burden on the government is the ability to draw a reasonable inference, and not a speculation, of guilt. . . . To permit a jury to draw an inference of the ultimate fact [by resorting to guesswork or conjecture] is to substitute the experience of logical probability for what the courts describe as 'mere speculation.'" *United States v. Villegas*, 911 F.2d 623, 628–29 (11th Cir. 1990) (discussing the standard for granting a directed verdict in a circumstantial evidence case) (citations omitted). In its brief, the State fails to point to any direct evidence that Defendant Heinze or Defendant Hutchens shot Mr. Robinson after the flashbang went off.[8] The State asserts in a footnote that it need not prove at this stage who shot at any given time since Defendants were parties to the crimes alleged and were acting in concert with other officers. (*See* Doc. 105 at 37).

---

[8] At the evidentiary hearing, the State presented the testimony of Greg Stutchman, an expert in the forensic analysis of audio/video. He opined that the shots after the flashbang sounded like they came from a 9 mm on auto burst mode. (Doc. 88 at 149). However, Defendant Hutchens's gun did not have an auto burst mode (Doc. 89 at 237) and Defendant Heinze was carrying a Glock 22 .40 caliber gun (Doc. 89 at 222). Thus, Stutchman's testimony would have to be revised as to Defendant Hutchens and would support an inference that Defendant Heinze did not fire those shots. Nonetheless, Defendant Heinze made an untimely motion to strike Stutchman's testimony (Doc. 104). While Stutchman's testimony, flawed as it is, could conceivably create a fact dispute, the State did not bother to cite it in its briefing, and "[c]ourts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or defense." *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (quoting *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007)). The Court considers the State's failure to cite to its own expert's testimony as an intentional choice and therefore will not consider it. Defendant Heinze's untimely motion to strike Stutchman's testimony (Doc. 104) is denied as moot.

However, under Georgia law "mere presence or approval of a criminal act is not sufficient to render one a party to the crime, and a conviction as a party to a crime requires proof that the defendant shared a common criminal intent with the principal perpetrator of the crime." *Jones v. State*, 740 S.E.2d 590, 593 (Ga. 2013). Although criminal intent is a question for the jury, there must be evidence from which a jury could infer that intent. *Id.*; *see also Brown v. State*, 302 S.E.2d 862, 864– 65 (Ga. 1983), *superseded by statute on other grounds as recognized in Bryant v. State*, 929 S.E.2d 802, 813 n.5 (Ga. 2026) (finding that lower court erred in not granting a directed verdict of acquittal where there was insufficient evidence of intent).

The State then asks the Court to infer that since Mr. Robinson was the only target, absent a reason to lie about an accidental discharge, those shots were fired at him intentionally. (Doc. 105 at 37). However, such a conclusion is speculative, especially considering that Defendant Heinze has maintained that he did not recall any shots being fired. Finally, even if someone intentionally shot Mr. Robinson after the flashbang, there is no evidence that those specific shots contributed to his death. The Court has already determined that Defendants' earlier use of deadly force was necessary and proper. Thus, to convict Defendants of aggravated assault with a deadly weapon, a jury would have to find that Mr. Robinson's death was caused solely by the shots fired after the flashbang. Given that the undisputed

32

evidence is that Mr. Robinson had already been shot numerous times and was non-responsive, no reasonable trier of fact could make this finding.

In its final argument, the State falls back on attacking Defendants' credibility, arguing that Defendants are not entitled to Supremacy Clause immunity because "[e]vidence shows that Defendants and their confederates made statements that were inconsistent and that contradicted the evidence, and that they worked with other witnesses to coordinate their non-credible stories, suggesting knowledge of guilt." (Doc. 105 at 9). Assuming for argument's sake that Defendants did lie, those lies alone would not make them guilty of aggravated assault and burglary. *Ash v. Georgia*, 865 S.E.2d 150, 169–70 (Ga. 2021) ("[E]vidence of an individual's actions and knowledge after the commission of the crimes is insufficient to satisfy the standard of [party to a crime]. At best, it would show that the individual was an accessory after the fact, not a party to the crimes.") (citation omitted). Because there is no evidence that Defendants had any criminal intent to commit those crimes prior to Mr. Robinson's death, the State has failed to come forward with evidence of a material factual dispute. The Court finds that Defendants are entitled to Supremacy Clause immunity on the aggravated assault-related charges (Counts 1 and 3).

33

## C.    The Remaining Charges

Counts 5 and 6 of the indictment charge Defendants with making false statements to a GBI agent who was investigating Mr. Robinson's death. However, the State has agreed that these counts should be dismissed because the Defendants gave their statements in Clayton County, which is outside of Fulton County's jurisdiction. (Doc. 105 at 45 n. 15; Doc. 140 at 75); *see Tesler v. Georgia*, 672 S.E.2d 522, 526–27 (Ga. Ct. App. 2009). Therefore, Counts 5 and 6 are dismissed. *See* Fed. R. Crim. P. 12(b)(3)(A)(i).

Counts 7 and 8 charge Defendants with violating their oath of office by committing the offenses of felony murder, aggravated assault with a deadly weapon or false statement. Because the Court determined that these underlying offenses must be dismissed, Counts 7 and 8 are also dismissed.[9] Furthermore, the State noted its intent to nolle prosequi these charges. (Doc. 184 at 2).

---

[9] The Court notes that if the unsigned oath of office attached to the indictment for Deputy United States Marshals was the one actually taken by Defendant Heinze, it did not require him to conform to the criminal laws of the state of Georgia, as alleged in the indictment. Therefore, Count 7 would be dismissed for another reason. *See Watkins v. State*, -- S.E.2d --, 2026 WL 1870566, at *5 (Ga. Ct. App. June 29, 2026).

## Conclusion

For the reasons given above, the Court finds that both Defendants Heinze and Hutchens are entitled to Supremacy Clause immunity.[10] Defendants' Motions to Dismiss (Docs. 29 and 31) are **GRANTED** and the indictment against them is **DISMISSED**. It is

**FURTHER ORDERED** that Defendant Heinze's original Motion to Dismiss (Doc. 30) and Motion to Exclude (Doc. 104) are **DENIED AS MOOT**.

**SO ORDERED** this 30th day of July, 2026.

Victoria Marie Calvert
United States District Judge

---

[10] Therefore, the Court does not need to reach Defendants' argument that they are entitled to self-defense immunity under Georgia law.